IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LYNN RASMUSSEN and GLENN RASMUSSEN, a married couple residing in Grace, Idaho,<br><br>            Plaintiffs,<br><br>v.<br><br>J.R. SIMPLOT COMPANY, a Nevada corporation; IDAHO DEPARTMENT OF AGRICULTURE, a department organized under the State of Idaho; IDAHO DEPARTMENT OF ENVIRONMENTAL QUALITY, a department organized under the State of Idaho; U.S. ENVIRONMENTAL PROTECTION AGENCY, an agency of the United State of America; JOHN AND JANE DOES I-X, yet unknown parties,<br><br>            Defendants. | Case No. 4:25-cv-00236-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiffs Lynn Rasmussen and Glenn Rasmussen's ("The Rasmussens") Motion for Emergency Injunctive Relief and Writ of Mandate. Dkt. 4. On May 30, 2025, the Court held oral argument[1] and took the Motion under advisement. Upon

---

[1] While the Idaho Department of Environmental Quality submitted a short Response to the Rasmussen's Motion and attended the hearing, the relief the Rasmussens requested only involves Simplot and the Idaho State Department of Agriculture. Therefore, this Order will only pertain to those two Defendants.

MEMORANDUM DECISION AND ORDER - 1

review, and for the reasons set forth below, the Court DENIES the Motion for Emergency Injunctive Relief and Writ of Mandate.

## II. BACKGROUND

The Rasmussens are seventh generation cattle ranchers based out of the Caribou Mountain Range in Southeast Idaho. Dkt. 1, at 5. Their ranch is made up of their own private land, land leased from the State of Idaho, and permitted cattle allotments from the National Forest Service in the Caribou National Forest. *Id.* at 6. As part of their operation, their cows are housed on their land in Grace, Idaho, during the fall and winter, moved to state land in mid-May, and are trailed through the federal allotments throughout the summer until mid-October before being returned to Grace. *Id.* at 6–7.

Defendant J.R. Simplot Company ("Simplot"), among their many operations, owns and operates the Smoky Canyon Mine ("Mine"), which is an open-pit mine for phosphate ore. *Id.* at 8. Mined phosphate ore is transferred by pipeline from the Mine to Simplot's Don Plant in Pocatello, Idaho.[2] *Id.* at 8–9. The pipeline is 86 miles long and goes through the Caribou-Targhee National Forest System. *Id.* at 9. In relevant part, a section of the pipeline sits on a ridgeline above a portion of the Rasmussens' federal allotments. *Id.* at 10.

Between May and July 2023, Simplot's pipeline leaked or was otherwise breached, resulting in a large Slurry spill throughout portions of the Rasmussens' federal allotments, where the cows were grazing and drinking from local streams. *Id.* The Rasmussens' son,

---

[2] The phosphate ore gathered from the Mine is refined and ground into powder before being mixed with water and other compounds for transport. This mix is referred to as "Slurry."

Danny, was moving cattle through the federal allotments in September 2023 when he discovered the non-contained Slurry, and the Rasmussens allege Simplot knew of the spill but failed to inform them prior to their own discovery. *Id.* at 13. There is significant debate between the parties as to how Simplot responded to the spill and what effect the spill had on the Rasmussens' cows.

Simplot asserts they discovered the full extent of the spill in August 2023, and upon such discovery, they complied with their reporting and cleanup obligations. Dkt. 19, at 16. This included cleanup efforts that began in September 2023 and continued throughout 2024. *Id.* at 16–17. As part of those cleanup efforts, Simplot installed exclusion fencing on portions of the Rasmussens' federal allotments. *Id.* The Rasmussens, on the other hand, contend no remediation had occurred as of October 2023. Dkt. 1, at 18.

Both parties have provided evidence on the effect of the spill on local vegetation, surface water, soil, and the Rasmussens' cows which, at least in part, seems to conflict. The Court will briefly summarize those competing positions based on the limited information before it.

Simplot retained an environmental consultant to specifically test vegetation and surface water. The results indicated water quality samples met regulatory standards with "little measurable increase in metals compared to background areas." Dkt. 19-3, at 6. While there were elevated Mercury levels throughout the area (not just in the area exposed to Slurry), Simplot provided two separate declarations that the vegetation data did not indicate exposure to the Slurry could cause harms through heavy metal exposure to the cows. Dkt. 19, at 18. In other words, according to one of Simplot's experts, "the likelihood of exposure

MEMORANDUM DECISION AND ORDER - 3

that these cows may have experienced was not sufficient to cause toxicity from cadmium or any other compound that may be present in the slurry and/or nearby environment." Dkt. 19-4, at 3.

The Rasmussens conducted both their own tests and have provided analysis of some of Simplot's test, which they contend paint a very different picture. First, Simplot allegedly conducted a study of the soil in the area in August 2023, which indicated high concentrations of heavy metals exceeding Environmental Protection Agency standards. Dkt. 1, at 14–15. The Rasmussens collected soil samples themselves in September 2023 and sent them for testing, which also showed high levels of heavy metals in the soil. *Id.* at 17–18. In October 2023, the Rasmussens began testing their cows for possible adverse effects resulting from Slurry exposure. This included the testing of hair samples and tissue samples, which did not suffice to determine the true effect on the animals. *Id.* at 20–21. Because the tests were not effective, the Rasmussens sent 12 cows for euthanization to obtain sufficient liver and kidney samples. *Id.* at 22. The results of those tests indicated the presence of mid to high levels of heavy metals and tissue damage to organs. *Id.* at 22–23. From December 2023 to March 2024, additional tissue samples were submitted from cows who had died, aborted fetuses, and stillborn calves, seeming to indicate concerning abnormalities which could be traceable to heavy metal exposure.[3] *Id.* at 23–24.

---

[3] Simplot contends these tests were insufficient to show any disease was caused by the Slurry. For example, age can increase cadmium concentrations in cows' kidneys, and the research did not reflect that. Dkt. 19, at 19. Importantly, Simplot's causation argument seems to be supported by the analysis of tests performed. For example, the toxicology interpretation noted, "Cadmium accumulates in the kidney naturally over time . . . . Results should be interpreted within this clinical context." Dkt. 1, at 165. Also important, "all other heavy metal values [besides cadmium] were normal." *Id.*

MEMORANDUM DECISION AND ORDER - 4

The Rasmussens have filed for emergency injunctive relief due to their continued need to care for approximately 280 cows exposed to the Slurry and the approximately 460 calves born to those cows over the past two years. They assert they lack both physical and financial resources to continue to care for the cows or to proceed with euthanization and disposal. Dkt. 4, at 4. They would like the Court to grant emergency injunctive relief and a writ of mandate requiring the disposal of the cattle at Simplot's expense with the Idaho Department of Agriculture ("ISDA") to facilitate the disposal. They also request monetary relief for the costs of care and management of the cattle over the past few years along with the value of the cattle.

## III. LEGAL STANDARDS

### A. Preliminary Injunction

The function of a traditional preliminary injunction is to preserve the status quo—the last uncontested status between the parties before the current controversy—pending a final determination on the merits of the case. *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). However, when a party is seeking a mandatory injunction—one which requires a responsible party to take action—the injunction goes beyond maintaining the status quo, is particularly disfavored, and requires a showing that the facts and law clearly favor the moving party. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (cleaned up). "In plain terms, mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

For the Rasmussens to obtain a preliminary injunction, the Court must weigh the four "*Winter* factors": (1) whether the Rasmussens are likely to prevail on the merits of its substantive claims, (2) whether they are likely to suffer imminent, irreparable harm absent an injunction, (3) whether the balance of equities favors an injunction, and (4) whether an injunction is in the public interest. *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22–23 (2008)). The Ninth Circuit has further instructed district courts to evaluate these factors "on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (cleaned up).[4]

Importantly, injunctive relief is only appropriate where the party seeking a preliminary injunction can demonstrate a likelihood of success on the merits of a claim for which injunctive relief would otherwise be appropriate. *See Piper v. Gooding & Co. Inc.*, 334 F. Supp. 3d 1009, n. 7 (D. Ariz. Aug. 10, 2018) (citing *Compass Bank v. Hartley*, 430 F. Supp. 2d 973 (D. Ariz. 2006)).

B. **Writ of Mandamus**

Under the All Writs Act, the Court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28

---

[4] As the Ninth Circuit has noted, there is a growing circuit split on the question of whether the sliding-scale approach is consistent with the Supreme Court's opinion in *Winter*. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 n.12 (9th Cir. 2024). The Court will continue to apply the sliding-scale approach because the Ninth Circuit has expressly held the approach is consistent with *Winter*. *Id*.

MEMORANDUM DECISION AND ORDER - 6

U.S.C. § 1651(a).[5] However, "this is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–260 (1947)).

Three conditions must be satisfied before a writ can properly issue under the All Writs Act: (1) the party seeking a writ must have no other adequate means to attain the relief desired, (2) the petitioner has the burden of showing they have a clear and indisputable right to the issuance of a writ, and (3) the district court must find, in its discretion, that a writ is appropriate under the circumstances. *Id.* at 380–81.

## IV. DISCUSSION

### A. Preliminary Injunction

#### 1. *Likelihood of Success on the Merits*

There is one glaring threshold issue with the Rasmussens' request for injunctive relief: they have not asserted any claim which would appropriately entitle them to injunctive relief, which makes it impossible for them to show they have a likelihood of success on the merits of such a claim. The Rasmussens call on the Court's "injunctive powers under F.R.C.P. § 65(a)-(d)" to issue the relief they are requesting. Dkt. 4, at 2. However, Federal Rule of Civil Procedure 65 does not give the Court an omnipotent power

---

[5] Both Simplot and the ISDA argue a writ of mandamus cannot be issued against them because, under the Federal Mandamus Statute (28 U.S.C. 1361), federal district courts do not have the power to use a writ to compel a state official to perform their duties (s*ee Beisenbach v. City and County of San Francisco*, 2025 WL 589035, at *2 (N.D. Cali. Feb. 24, 2025) (citing *Fox v. City of Pasadena*, 78 F.2d 948 (9th Cir. 1935)), and the federal mandamus statute only applies to federal officers and employees, so a writ cannot be used to compel a private company to act. *See id.* at *2; 28 U.S.C. § 1361. The Rasmussens are requesting a writ under the All Writs Act, not under the federal mandamus statute. As such, their arguments are largely not applicable here. The Court will analyze the Rasmussens' right to a writ under the All Writs Act standard.

to grant injunctive relief without an underlying basis for doing so.[6] Such a basis does not exist here.

Of the seven counts asserted, Count I simply asserts the Rasmussens should be granted injunctive relief. Dkt. 1, at 44. Injunctive relief, however, is not an independent cause of action. *Hamilton v. Bank of Blue Valley*, 746 F. Supp. 2d 1160, 1182 (E.D. Cal. 2010) ("Injunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted." (cleaned up)).

The other six counts assert claims based on the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), negligence, nuisance, trespass, and the Clean Water Act. *See generally id at* 47–56. None of these are cited as grounds for the injunctive relief requested at this time and none authorize the relief requested.[7] The Court will quickly address why each claim fails to support injunctive relief.

First, ". . . when Congress wished to provide for injunctive relief under CERCLA, it knew how to do so and did so expressly," and that does not include a private right to injunctive relief in situations such as these.[8] *Cadillac Fairview/California Inc. v. Dow Chemical Co.*, 840 F.2d 691, 697 (9th Cir. 1988).

---

[6] For example, 16 U.S.C. § 1333 permits the Bureau of Land Management ("BLM") to remove excess animals on public land, starting with old, sick, and lame, and humanely dispose of them to carry out its duties. If the BLM failed to comply with such, injunctive relief could potentially be a proper remedy. *See In Defense of Animals v. United States Dept. of Interior*, 737 F. Supp. 2d 1125 (E.D. Cal. Aug. 9, 2010); *Animal Protection Institute of America, Inc. v. Hodel*, 671 F.Supp. 695 (D. Nev. July 8, 1987).

[7] Because the Court has reached this conclusion, it will not reach the merits of Simplot's sovereign immunity argument or its "lack interest in its funds" argument. *See* Dkt. 19, at 8.

[8] The only private right to an injunction under CERCLA is set forth in 42 U.S.C. § 9607(a), and that is related to response costs incurred with a national contingency plan. No such circumstances exist here. While the Rasmussens are seeking costs under § 9607(a) in their Complaint (Dkt, 1, at 48), the relief requested in

Second, the Rasmussen's claims under negligence per se are related to hazardous waste management, not the management of livestock after they have potentially been exposed to hazardous waste. The statutes under which the Rasmussen's are seeking relief do not provide a private right to grant the relief sought – the disposal of the cattle by a state agency paid for by a potential contaminator. Additionally, while it is not unheard of to grant injunctive relief related to a negligence claim, doing so is generally done to place the parties back to where they were before the controversy and avoid irreparable harm. *See Savage Lateral Ditch Water Users Ass'n v. Pulley*, 869 P.2d 554, 560–61 (Idaho 1993). Requiring the disposal of the cows here would not preserve the status quo between the parties. This is even more critical considering the parties disagree that the cows are contaminated and in need of disposal in the first instance. Also, as will be addressed below, there is not a likelihood of irreparable harm because monetary damages will likely suffice to repair any harm done here, as is evidenced by the Rasmussen's request solely for monetary damages under these causes of action. Therefore, the Court will not exercise its discretion to grant injunctive relief under the Rasmussen's negligence claim.

Third, Simplot is correct that Idaho Code § 52-111 does provide a private right of action to enjoin or abate a nuisance, and the Court finds a plain reading of that statute suggests injunctive relief is limited to controlling the nuisance itself. The nuisance in this case is the spill, and the Rasmussens are not seeking further cleanup of the spill at this time,

---

the preliminary injunction is separate and the pleadings at this point do not establish a likelihood of success on the merits of such a claim. The Rasmussens have not provided sufficient evidence that a national contingency plan is in place here.

or more protection for the cows against the lasting effects of the spill. The affected cows are not themselves a part of the nuisance. Therefore, a preliminary injunction requiring their disposal would not be geared towards abating the nuisance and would not be proper under this cause of action.

Fourth, the Rasmussens are bringing a claim for trespass under Idaho Code § 6-202, which only allows for monetary damages, not injunctive relief. IDAHO CODE § 6-202(3).

Finally, the Clean Water Act only allows for an injunction "to enforce . . . an effluent standard or limitation," which does not include a standard or limitation related to the disposal of livestock exposed to potentially contaminated water. 33 U.S.C. § 1365(a)(2), (f).

Put simply, the Rasmussens have not brought forth a single cause of action or cited to any statute or case which gives the Court the authority to order Simplot to pay for the disposal of the cows facilitated by the ISDA. They failed to do so even when the Court directly asked for such support during oral argument. The Court simply cannot do what they are asking using a preliminary injunction.

Additionally, the Court acknowledges the Rasmussens are requesting mandatory injunctive relief, which requires them to make a showing that the facts and the law clearly favor them above and beyond what would be required if the Rasmussens were merely attempting to preserve the status quo. Setting aside the acknowledged defects in the law supporting this injunction, the well-supported debate between the parties on what damage has been done both environmentally and to the Rasmussen's cattle due to the Slurry make it next to impossible to determine, at this stage, whether the Rasmussens have a likelihood

of success on the merits of any of their claims. There is also competing evidence on whether Simplot responded properly to the spill as they were obligated to do under both federal and state law. Discovery will be critical in this fact-heavy case, but the Rasmussens cannot currently show the facts *clearly* favor them such that injunctive relief is warranted.

In particular, Simplot has effectively presented arguments that the data as it currently stands does not actually indicate the Rasmussen's cows are contaminated, and even less so, that any contamination was caused by the Slurry spill. That is not to say further discovery will not establish such contamination or causation, but the success on the merits threshold is not met at this time.

Thus, the Rasmussens have failed to show a likelihood of success on the merits of a claim which would support the injunctive relief requested.

2. *Irreparable Harm*

Both Simplot and the ISDA correctly point out that irreparable harm does not exist where there is an adequate remedy at law in the form of compensatory damages.[9] *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Any harm suffered by the Rasmussen's cattle has already occurred. If they were contaminated by the spill, steps have been taken to prevent further exposure, and the loss in their value due to the exposure can be compensated with monetary damages. Any harm the Rasmussens' ranch and business is currently facing (or will be facing in the future) can all be compensated

---

[9] Simplot and ISDA are also correct that an award of monetary damages using an injunction is not appropriate, as injunctions are an equitable remedy whereas monetary damages are a legal remedy. The Court will not award the Rasmussens the value of the cattle or the cost of care and management of the cattle using an injunction. Damages will be properly discussed after a final determination on the merits of the case.

MEMORANDUM DECISION AND ORDER - 11

with money damages after the litigation process runs its course.

The Court acknowledges that money can feel like a very lacking remedy when dealing with something like harm to cows bred over generations. If the Court could issue injunctive relief which could turn back the hands of time and prevent any damage to the Rasmussens ranch or cattle, it would attempt to do so. Unfortunately, the relief requested will not do so, and monetary compensation is the only appropriate remedy under the law—should the Rasmussens prevail on their claims.

3. *Balance of Equities and Public Interest*

When a government entity is a party to a case, the analysis of the balance of equities and public interest merge into one. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). The balance of equities weighs heavily in favor of both Simplot and the ISDA here. First, Simplot is correct that the destruction of the cattle before further testing in discovery would be highly prejudicial, as it would prevent Simplot from gathering data necessary to defend itself from accusations that the cattle are contaminated. It seems the cattle have only been tested in a very limited fashion up until this point, and the data gathered seems to be limited in the information it provides. The existing tests simply do not seem to provide a fair opportunity for Simplot to defend itself, so the preservation of cattle is essential until further tests can be conducted.

As to the ISDA, it is correct that Idaho Code §§ 203–214 does not authorize, let alone mandate, that it can dispose of cattle contaminated by heavy metals. Because the ISDA is an Idaho state agency, it is only able to act within the scope of the statutes giving

MEMORANDUM DECISION AND ORDER - 12

it power. *Welch v. Del Monte Corp.*, 915 P.2d 1371, 1372 (Idaho 1996) ("An administrative agency is a creature of statute, limited to the power and authority granted it by the Legislature . . . ."). Those sections only authorize the condemnation and disposal of animals who carry or have been exposed to contagious, infectious, or communicable diseases, and heavy metal exposure simply does not fit that definition under the statute.[10] IDAHO CODE § 25-210(1)(e). Thus, it would be against the public interest to require the ISDA to use taxpayer dollars to perform an act which it is not authorized to perform.

The Court does not wish to minimize the seriousness and weight of this situation on the Rasmussens. The Court acknowledges the heavy burden this spill has had on them personally and on their ranch which has been in their family for over a century. However, all parties must have an opportunity to fairly present their case, which takes time. If the Rasmussens are successful in their case, they will likely be entitled to compensatory damages which will largely mitigate the harms they have suffered and could potentially suffer moving forward. Thus, it is more equitable to allow the case to move forward without the destruction of the cows, which could prove to be valuable evidence in the future for both sides.

4. *Discovery Concerns*

The Court would be remiss to not address its concerns about discovery as part of this order. Simplot briefly indicated its position that the destruction of the cattle, at this

---

[10] The definition of contagious is "transmissible by direct or indirect contact with an infected [animal]." *Contagious*, Merriam-Webster Dictionary (2025). Cows exposed to heavy metals would not be able to expose other animals to heavy metals simply through contact. Thus, heavy metal exposure is not a contagious disease.

MEMORANDUM DECISION AND ORDER - 13

stage of the litigation, "would in practice amount to spoliation of evidence." Dkt. 19, at 13. The Court tends to agree. The Rasmussens were only able to get any meaningful results when testing potentially harmed cows by having them euthanized and studying live tissue samples from internal organs. To order the destruction of all the potentially-affected cows before Simplot has a chance to run independent tests would be patently unfair and make it potentially impossible for it to defend against the allegations that the Slurry harmed the cows. It is critical that the cows remain available as evidence during discovery, which the Court will address further below.

### B. Writ of Mandate

As outlined above, in order for the Court to issue a writ, the requesting party must show there are no other alternatives, they have a right to a writ, and the writ is appropriate. *See Cheney*, 542 U.S. at 380. The Court will first address the third requirement of issuing a writ: it does not find, in its discretion, that there is a "really extraordinary cause" here which would justify issuing a writ in these circumstances. First, as will be discussed in the following section, there is a way for the Rasmussens to attain the relief they desire without a writ being issued. The Rasmussens' livelihood is at serious risk because they are caring for cows which: (1) they do not feel they can sell, (2) they do not have the means to care for, and (3) are leading to their financial insolvency. While they are seeking the disposal of the cows at Simplot's expense, there is no way for the Court to authorize such relief. It is clear, however, that what the Rasmussens ultimately want is to release themselves from the burden of continually caring for the possibly-contaminated cows pending litigation

without being forced to sell the cows.[11] Under the rules of discovery, Simplot can be responsible for the cost of caring for the cows pending the litigation of this case. So, the Rasmussens have adequate means to attain the relief they ultimately desire.

The Rasmussens have also not shown they have a clear and indisputable right to the issuance of a writ. They make a passing reference to the All Writs Act but provide little further justification for why a writ is appropriate here. Additionally, there is no statute that requires the ISDA to dispose of cattle contaminated with heavy metals (even if it were clear the cows are contaminated),[12] and no statute which requires Simplot pay for such disposal at this early stage in the litigation. With no certain mandatory duty owed by either ISDA or Simplot to the Rasmussens that cannot be later resolved using compensatory damages, a writ should not issue here. For these reasons, the Motion for Writ of Mandate is DENIED.

## C. Preservation of Discovery

While the Court is denying the Rasmussens Motion, it still recognizes the need, as briefly discussed above, to preserve the cows for discovery purposes, and it also recognizes that the Rasmussens simply do not have the resources to continue to care for these cows. The denial of the instant Motion does not leave the Rasmussens without any relief, because the Court may exercise its discretion under Federal Rule of Civil Procedure 26(c) to enter an order protecting a responding party from "undue burden or expense" by requiring the

---

[11] The Rasmussens contend they cannot afford to maintain the cows, and they do not want to risk their reputation or expose themselves to potential liability by selling contaminated cows for potential human consumption or otherwise.

[12] Idaho Code § 25-210(1)(e) authorizes and empowers the state agents to dispose of animals exposed to contagious, infectious, or communicable diseases, but it does not *mandate* they disposal of said animals.

MEMORANDUM DECISION AND ORDER - 15

payment of the costs of discovery by a party who seeks discovery. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).[13]

The Court finds the Rasmussens would be subject to undue burden and expense if they were required to continue keeping the cows alive and healthy throughout this litigation. From the evidence presented, it seems the Rasmussens have been actively collaborating with state officials, agencies, and Simplot itself to resolve the situation at hand for the past two years. During that time, they have continued to care for the cows, even with the knowledge they, at the very least, would not feel comfortable turning a profit on potentially contaminated cows. Simplot has conceded that the disposal of the cows would be highly prejudicial to its case, as it would not be able to defend against accusations that the cows are contaminated. Presumably, it will be seeking further discovery and tests on the cows to prepare its case. Simplot, as an extremely large corporation, is in a much better position to preserve the cows as evidence than the Rasmussens are, who are facing foreclosure on their ranch. As such, the Court will exercise its discretion under Rule 26(c) to require Simplot to pay for the costs of maintaining and caring for all the cows potentially affected by heavy metal exposure due to the Slurry spill for the duration of this litigation.[14]

---

[13] Specifically, *Oppenheimer* states, under the rules of evidence, "the presumption is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery." 437 U.S. at 358.

[14] Simplot indicated at oral argument that it would be willing to purchase all the cows that have been potentially contaminated at fair market value from the Rasmussens. In hearing that offer, the Court suggested the parties attend a mediation to see if such a sale could be arranged. The parties have been actively engaged in settlement negotiations since June 18, 2025, with Magistrate Judge Deborah K. Grasham, but the parties have yet to reach a resolution. No matter the outcome of that settlement, whether

## V. CONCLUSION

The Rasmussens have failed to meet their burden in showing they have a likelihood of success on the merits of a claim which could support a preliminary injunction. Additionally, the Court does not have the authority to issue a writ against Simplot or the ISDA. Thus, the Rasmussen's Motion is DENIED. However, the cows must be maintained for purposes of discovery, and Simplot must bear the costs of that preservation.

## VI. ORDER

1. The Rasmussens' Motion for Emergency Injunctive Relief and Writ of Mandate (Dkt. 4) is **DENIED**.

2. In accordance with Federal Rule of Civil Procedure 26(c), every cow which has allegedly been contaminated must be preserved for discovery, with Simplot to bear the costs of such preservation.

3. The previously-imposed stay of the deadlines in this case (Dkt. 29) is now LIFTED.

    a. Any party's Response to Simplot's Motion to Dismiss (Dkt. 25) and Motion to Strike (Dkt. 26) will be due 21 days after this Order is issued.

    b. Simplot's Reply, if any, will be due 14 days after the filing of any Response.

DATED: June 30, 2025

David C. Nye
Chief U.S. District Court Judge

---

the cows are purchased by Simplot, remain with the Rasmussens, or are subjected to other arrangements, the cows must be preserved for discovery, and the cost of preservation will be borne by Simplot.